ADOLPHO A. BIRCH, JR., SP. J.,
concurred in part and dissented in part.
APPENDIX
(Excerpts from the Court of Criminal Appeals’ Decision)
IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
November 17, 2004 Session
STATE OF TENNESSEE v. PAUL DENNIS REID, JR.
Criminal Court for Davidson County
No. 97-C-1836
No. M2003-00539-CCA-R3-DD-Filed June 3, 2005
Defendant Paul Dennis Reid, Jr., was found guilty by a jury of three counts of premeditated murder, three counts of felony murder, one count of attempted murder, and one count of especially aggravated robbery. The felony murder convictions were merged into the premeditated murder convictions. Thereafter, the jury sentenced Defendant to death based upon the finding of four aggravating circumstances: the defendant had previously been convicted of one or more felonies, other than the present charge, the statutory elements of which involve the use of violence to the person; the murders were committed for the purpose of avoiding, interfering with or preventing a lawful arrest or prosecution of defendant or another; the murder was knowingly committed, solicited, directed or aided by the defendant, while the defendant had a substantial role in committing or attempting to commit, or was fleeing after having a substantial role in committing or attempting to commit robbery; and the defendant committed “mass murder,” which was defined at the time of the commission of these offenses as the murder of three or more persons within the State of Tennessee within a period of forty-eight months, and perpetrated in a similar fashion in a common scheme or plan. TenmCode Ann. § 39-13 — 204(i)(2), (6), (7), and (12) (Supp.1996). The trial court sentenced Defendant to 25 years imprisonment for the attempted murder conviction and 25 years imprisonment for the especially aggravated robbery conviction, to be served consecutively to each other and to Defendant’s other non-death sentences. On appeal, Defendant presents forty-seven issues. We affirm Defendant’s convictions and sentences.
Tenn. R.App. P. 3 Appeal as of Right; Judgment of the Criminal Court for Davidson County Affirmed
Thomas T. Woodall, J., delivered the opinion of the court, in which Alan E. Glenn and RobeRT W. WedemeyeR, JJ., joined
Thomas F. Bloom and James A. Simmons, Nashville, Tennessee, for the appellant, Paul Dennis Reid, Jr.
Paul G. Summers, Attorney General and Reporter; Michael E. Moore, Solicitor General; and Angele M. Gregory, Assistant Attorney General, for the appellee, State of Tennessee
OPINION

[Deleted: SUMMARY OF FACTS]

[Deleted: PROOF] ANALYSIS

On appeal, Defendant has presented multiple issues, which we will address as follows.
*823 1. Failure to dismiss indictment because aggravating factors not listed in indictment
First, Defendant contends that because the indictment returned against him did not set forth the statutory aggravating circumstances relied upon by the State in charging him with a capital offense, the indictment is faulty and must be dismissed. Defendant acknowledges that he made this same argument in the appeal of his Montgomery County convictions and sentences, but it was rejected by this court. Defendant urges this court to reconsider its decision in State v. Reid, No. M2001-02753-CCA-RB-DD, 2003 WL 23021393 (Tenn.Crim.App., Nashville, Dec. 29, 2003). However, the Tennessee Supreme Court has released its opinion in the appeal of Defendant’s Montgomery County convictions, and the Court reaffirmed its earlier decisions in holding that “Tennessee’s capital sentencing scheme does not require that aggravating circumstances be included in an indictment.” State v. Reid, 164 S.W.3d 286, 312 (Tenn.2005). Accordingly, the trial court did not err in refusing to dismiss the indictment. Defendant is not entitled to relief on this issue.
2. Constitutionality of Tenn Code Ann. Sec. 39-13-204(c)
Defendant contends that Tennessee Code Annotated Section 39-13-204(c) is unconstitutional. However, he has not presented any constitutional challenges to the death penalty statutes that have not been previously reviewed and rejected. The death penalty statutes have repeatedly been held constitutional. See e.g., State v. Keen, 31 S.W.3d 196, 233 (Tenn.2000), cert. denied, 532 U.S. 907, 121 S.Ct. 1233, 149 L.Ed.2d 142 (2001); State v. Nesbit, 978 S.W.2d 872, 902 (Tenn.1998), cert. denied, 526 U.S. 1052, 119 S.Ct. 1359, 143 L.Ed.2d 520 (1999); State v. Vann, 976 S.W.2d 93, 117 (Tenn.1998), cert. denied, 526 U.S. 1071, 119 S.Ct. 1467, 143 L.Ed.2d 551 (1999); State v. Bland, 958 S.W.2d 651, 663 (Tenn.1997), cert. denied, 523 U.S. 1083, 118 S.Ct. 1536, 140 L.Ed.2d 686 (1998); State v. Smith, 857 S.W.2d 1, 21-22 (Tenn.), cert. denied, 510 U.S. 996, 114 S.Ct. 561, 126 L.Ed.2d 461 (1993); State v. Bane, 853 S.W.2d 483, 488 (Tenn.1993), cert. denied, 510 U.S. 1040, 114 S.Ct. 682, 126 L.Ed.2d 650 (1994).
Defendant relies upon the case of United States v. Fell, 217 F.Supp.2d 469 (D.Vt.2002) in arguing that Tennessee’s capital sentencing scheme, particularly Tennessee Code Annotated Section 39-13-204(c), is unconstitutional because it allows the death penalty to be imposed based on evidence that is not subject to the guarantees of reliability and trustworthiness required by the due process and confrontation clauses of the federal constitution. However, the Supreme Court rejected this argument recently in State v. Berry, 141 S.W.3d 549 (Tenn.2004). Defendant is not entitled to relief on this issue.
3.Validity of search warrants
Defendant contends the trial court erred in denying his motion to suppress evidence seized pursuant to search warrants 146 and 149. Defendant concedes that this issue has been decided against him adversely in State v. Reid, 91 S.W.3d 247 (Tenn.2002), but makes the argument for the purpose of preserving the issue for further review. This court must follow the holding of the Tennessee Supreme Court on this issue as set forth in State v. Reid, 91 S.W.3d at 273-76. Defendant is not entitled to relief on this issue.
*824 4. [Deleted: Evidence of Defendant’s financial condition]
5. [Deleted: Testimony of Mitchell Roberts]
6. Admissibility of identification testimony
Next, Defendant contends that the trial court erred in failing to suppress Jose Gonzales’ identification of him. In his motion to suppress, Defendant argued that the photographic lineup conducted by the Metropolitan Nashville Police Department was unduly suggestive and resulted in an unreliable identification. In support of his motion, Defendant specifically argued that the background of his photograph is lighter in color than the other photographs; that Defendant is the only person pictured smiling; that Defendant’s picture was placed in the center top row where a viewer’s eye is naturally drawn; that the viewing of the photographic lineup in question occurred at night, unlike the other viewings by Gonzales; that the photographic lineup in question was different because Gonzales had viewed all of the previous photographs in a book; and that there was a heightened sense of excitement on the night of the lineup in question. The trial court rejected each of Defendant’s arguments and found that the lineup and the procedures used in displaying the lineup were not unduly suggestive.
The trial court was very specific in its order denying Defendant’s motion to suppress Gonzales’ identification. The court found that although the background of Defendant’s picture is lighter than the backgrounds of the other five photographs, none of the backgrounds depicted in the pictures are identical. Additionally, the court found that the physical characteristics of the men depicted in the photographs are quite similar in many respects. As a result, the backgrounds in no way suggest that the viewer should select a particular photograph. The court also acknowledged that Defendant was the only person who showed his teeth in his photograph, but found that each photograph had a unique characteristic. Accordingly, the viewer’s eye is not attracted to one particular photograph. The court rejected Defendant’s contention that the placement of Defendant’s photograph in the top center of the lineup drew the viewer’s eye to that particular picture. The court found that Defendant had not presented any evidence to support this contention. The court further found that there was no evidence that Gonzales was aware that an arrest was imminent and that other witnesses had been called to the police station to view lineups. Additionally, the court found that the fact that Gonzales viewed the lineup at night was insignificant. The court determined that there had not been a formal or rigid viewing schedule prior to the night in question. Instead, the testimony revealed that the prior meetings were arranged as schedules and Gonzales’ medical condition permitted. The court also found that there was no evidence that Gonzales’ identification was affected by the viewing of the lineup in a different format than before. Although Gonzales may have only viewed photographs in a book, his identification was not affected by viewing the six picture photographic lineup presented to him. The court also rejected Defendant’s contention that a physical lineup would have been more trustworthy and should have been conducted. The court noted that Gonzales had never been asked to view a physical lineup in the past, and the court opined that a physical lineup would have drawn more attention to the importance of that particular viewing. The court also surmised that the police did not have adequate time to locate men who had similar physical characteristics to conduct *825 a physical lineup given all of the circumstances. Based on the foregoing, the court concluded that the lineup and the procedures utilized in displaying the lineup were not unduly suggestive.
This court first notes that the findings of fact made by the trial court at the hearing on a motion to suppress are binding upon this court unless the evidence contained in the record preponderates against them. State v. Ross, 49 S.W.3d 833, 839 (Tenn.2001). Absent a showing by Defendant that the evidence preponderates against the judgment of the trial court, this court must defer to the ruling of the trial court. State v. Cribbs, 967 S.W.2d 773, 795 (Tenn.), cert. denied, 525 U.S. 932, 119 S.Ct. 343, 142 L.Ed.2d 283 (1998).
As the trial court correctly espoused, the United States Supreme Court established a two-part test to assess the validity of a pretrial identification in Neil v. Biggers, 409 U.S. 188, 199-200, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972). Specifically, the court must determine (1) whether the procedure used to obtain the identification was unduly suggestive and (2) if the identification was unduly suggestive, the court must determine, under the totality of the circumstances, whether the identification is nevertheless reliable. Id. After a review of the record, this court must concur with the trial court’s findings that the lineup and the procedures used in the lineup were not unduly suggestive. The evidence does not preponderate against the findings of the trial court. Defendant is not entitled to any relief on this issue.
7. Court hours
Defendant contends that the trial court erred in holding “late night” court sessions in this case. Prior to trial, Defendant filed a “Motion for Reasonable Court Horn’s During Jury Selection and Trial.” Defendant requested that court hours be limited to 9:00 a.m. to 5:00 p.m. The trial court ruled that the court hours would be the same as those held in Defendant’s prior Davidson County case, in which Defendant was tried and convicted of the murders of two Captain D’s employees. The following schedule was followed by the trial court:

JURY SELECTION:

May 15: 9:00 a.m. — Court called into session 7:15 p.m. — Court adjourned for the day
May 16: 9:00 a.m. — Court resumed 6:45 p.m. — Court adjourned for the day
May 17: 9:00 am. — Court resumed 8:00 p.m. — Court adjourned for the day
May 18: 9:00 a.m. — Court resumed 5:05 p.m. — Court adjourned for the day
May 19: 9:00 am. — Court resumed The record does not reflect the time court was adjourned. The trial court asserts that court was adjourned at 4:00 p.m.
THREE DAY BREAK BETWEEN JURY SELECTION AND TRIAL TRIAL
May 22: 8:30 am. — Trial proceedings began; jury-out proceedings 10:00 am. — Jury brought into court 7:30 p.m. — Jury excused for the day 7:55 p.m.' — Court adjourned for the day
May 23: 8:30 a.m. — Court resumed 7:30 pm. — Jury excused for the day 7:50 p.m. — Court adjourned for the day
May 24: 8:30 am. — Court resumed 4:26 pm. — Jury retired to jury room for deliberations 8:37 pm. — Jury excused for the day 8:39 pm. — Court adjourned for the day
May 25: 8:30 am. — Court resumed 8:53 am. — Jury retired to jury room for deliberations 8:50 p.m. — Jury returned to court to announce verdict 8:56 pm. — Jury excused for the day 9:05 p.m. — Court adjourned for the day
May 26: 8:30 a.m. — Court resumed; jury-out hearing conducted 10:34 am. — Jury returned to open court for penalty phase testimony 7:25 p.m. — Jury excused for the day 7:55 pm. — Court adjourned for the day
May 27: 8:30 a.m. — Court resumed; jury-out hearing conducted
*826 8:42 a.m. — Jury returned to open court and penalty phase resumed 2:42 p.m. — Jury retired to the jury room for deliberations on the sentence 6:35 p.m, — Jury returned to open court and announced its sentence
In State v. Parton, 817 S.W.2d 28 (Tenn.Crim.App.1991), this court addressed the issue of “late night” court sessions as follows:
It is clear in this state that late night court sessions should be scheduled “only when unusual circumstances require it.” [State v.] McMullin, 801 S.W.2d [826], 832 [ (Tenn.Crim.App.1990) ]. Regardless of whether counsel or any juror objects, the late night sessions should be avoided; and they must be justified because of unusual circumstances. If the requisite unusual circumstances do exist and late night sessions are scheduled because of necessity, good practice would be to also let the record affirmatively reflect that all counsel and all jurors expressly agree. But the threshold question which must always be determined by the court is whether the circumstances justify the unusual session.
Id. at 33.
In his appeal of his convictions and sentences of the Captain D’ murders, Defendant argued that the trial court committed reversible error by holding late night court sessions. In that case, this court rejected Defendant’s arguments. This court specifically found that the record did not support Defendant’s argument that the court kept excessively late hours during trial, and the Tennessee Supreme Court affirmed this court’s decision and published that portion of the opinion as an appendix to its opinion. State v. Reid, 91 S.W.3d 247, 288, 300-01 (Tenn.2002).
This court must conclude in this case, as well, that the record does not support the argument that the court kept excessively late night hours. In support of its decision to extend the court day beyond eight hours, the trial court explained that this case was a capital murder case that had received extensive media attention. As a result, the court had gone outside of the county to secure a jury, and the jury was required to be sequestered and “locked away from family, friends and employment until the conclusion of the trial.” We do not find that the trial court abused its discretion in extending the court hours in this case beyond eight hours per day. Defendant is not entitled to relief on this issue.
8. [Deleted: Recusal]
9. Testimony of Joe Ingle
At Defendant’s competency hearing, Defendant called Reverend Joe Ingle as a witness. Reverend Ingle has served as Defendant’s pastor since June 1997, the month he was arrested. The trial court ruled that Reverend Ingle could not testify as to his conversations with Defendant because Defendant had not waived his priest-parishioner privilege. The court allowed Reverend Ingle to testify as to his general impressions of Defendant. Defendant asserts that the trial court erred in limiting Reverend Ingle’s testimony. Specifically, Defendant contends that because he was incompetent, and should have been presumed incompetent by the trial court, he was also incompetent to assert the priest-parishioner privilege. Accordingly, Reverend Ingle’s testimony should not have been limited.
In the appeal of his Montgomery County convictions, Defendant argued that the trial court erred in excluding the testimony of Reverend Ingle. Our Supreme Court rejected Defendant’s arguments as follows:
In our view, the trial court did not err in excluding the testimony. First, our conclusion that a defendant bears the bur *827 den of establishing his or her incompetency necessarily means that he or she has not been found to be incompetent before or during the competency proceeding itself. As a result, nothing prevents a defendant from invoking an applicable privilege during a competency proceeding as a matter of law. Moreover, the trial court is free to reconsider the issue of the defendant’s invocation of privileges while evidence of the defendant’s mental status is presented during the hearing by both the defense and prosecution.
Second, a defendant’s right to present evidence to meet the burden of proof does not eliminate the trial court’s discretion in determining relevance and materiality of the evidence. Here, the defendant presented extensive expert testimony to show that he was not competent to stand trial. The expert witnesses related the basis of their opinions, which included analysis of the defendant’s family background, history of head injuries, and mental illness.... In sum, the defendant’s exercise of his privileges did not prevent the trial court from fully considering the material evidence and making a thorough assessment of the relevant issues pertaining to the defendant’s competency to stand trial. Accordingly, we conclude that the trial court did not err in excluding the testimony of the witnesses.
State v. Reid, 164 S.W.3d at 309. After a review of the evidence in this case, and based upon the above-quoted rationale of the Supreme Court, we conclude that the trial court did not err in limiting the testimony of Reverend Ingle. Defendant is not entitled to relief on this issue.
10. Testimony of Maureen McGinley
Defendant sought to introduce the testimony of Maureen McGinley at the competency hearing. Ms. McGinley served as Defendant’s jury consultant during the Captain D’s murder trial in April 1999. Ms. McGinley had not had any contact with Defendant following that trial. Yet, Defendant wanted to elicit testimony from her regarding his actions during April 1999 to buttress his contention that he was incompetent to stand trial in this case.
As this court has explained, a hearing to determine if a defendant is competent to stand trial does not focus on the defendant’s guilt or innocence or even the defendant’s mental condition at the time of the crime. Instead, a competency hearing is “a very narrow inquiry aimed at determining whether one who is charged with a criminal offense is presently competent to stand trial.” State v. Stacy, 556 S.W.2d 552, 553 (Tenn.Crim.App.1977). The testimony of Maureen McGinley as to Defendant’s conduct during his April 1999 trial has not been shown to be relevant to the issue of Defendant’s competency at the time of the hearing in this case. Moreover, a memorandum authored by Ms. McGinley was admitted into the record and considered by the trial court. The memorandum set forth Defendant’s behavior during his April 1999 trial. Defendant is not entitled to relief on this issue.
11. Testimony of Carla Crocker
Defendant also contends that the trial court erred in excluding the testimony of Carla Crocker, the Public Affairs Officer for the Davidson County Sheriffs Office, from his competency hearing. Ms. Crocker would have testified that in March 1999, Defendant attempted to call a press conference in which he intended to discuss a dispute with the sheriffs office involving an allegation that a chicken bone had been found in his cell. In excluding Ms. Crock-er’s testimony, the court concluded that (1) *828 the event was too remote in time and was therefore not relevant and (2) the court had prevented the press conference by issuing a gag order. Defendant admitted that Ms. Crocker had not had any contact with Defendant since the incident in March 1999.
We conclude that Ms. Crocker’s testimony was not relevant to Defendant’s current competency. See Tenn. R. Evid. 401. We cannot determine that the trial court erred in excluding the testimony of Carla Crock-er. Defendant is not entitled to relief on this issue.
12. Denial of funds for evaluation of Defendant by Dr. Xavier Amador
As has been previously discussed, during the competency proceedings Defendant moved to have Dr. Xavier Amador testify on Defendant’s behalf. The court denied the request. The court had previously approved funds for Dr. Amador to evaluate Defendant’s competency, but the court rescinded its previous ruling. The court explained that it had previously approved funds in the abstract for Dr. Ama-dor, to keep a monitor on Defendant’s condition, but the monitoring had not occurred. Dr. Amador had not seen Defendant in six months. Defendant had been evaluated by a defense expert, would be evaluated by an expert on behalf of the State, and would be evaluated by an independent expert. Accordingly, the court determined that there was no reason to have Dr. Amador evaluate Defendant currently. The court further explained that time was of the essence. The court also noted that Supreme Court Rule 18 did not permit it to hire a second expert, especially an out-of-state expert.
Defendant argues that the trial court’s ruling “might have made sense” if the court had rendered a decision on the testimony of Dr. Auble, Dr. Martell, and Dr. Caruso. However, Defendant asserts that once the court secured a second independent evaluation of Defendant, the court was obligated to provide funds to enable Dr. Amador, who had extensive experience with Defendant, to perform an evaluation. Defendant cites to no case law to support his assertion that the court was obligated to provide funds for Dr. Amador once the court sought a second independent evaluation. Defendant further contends that the trial court’s ruling constitutes a denial of his right to call witnesses on his own behalf, as well as his rights to due process and a fair trial.
Defendant’s assertions are not supported by statute or case law. Tennessee Code Annotated Section 40-14-207 provides that in capital cases where a defendant has been found indigent, the court may, in its discretion, determine that expert services are necessary to ensure that the constitutional rights of the defendant are protected. The Supreme Court has analyzed section 40-14-207 of the Tennessee Code and has held that it does not entitle a defendant to an expert of his choice. Rather, an indigent defendant must be provided with the tools necessary to present an adequate defense. State v. Smith, 857 S.W.2d 1, 12 (Tenn.1993). The court provided funds for Defendant to obtain the services of Dr. Pamela Auble. Dr. Auble, unlike Dr. Amador, had maintained a continuous relationship with Defendant. Moreover, Dr. Amador’s practice was in New York, and Defendant did not demonstrate the need for an out-of-state expert as contemplated by Supreme Court Rule 13.
Based on the foregoing, we conclude Defendant is not entitled to relief on this issue.
*829 13. Denial of continuance of competency hearing
As has been previously set forth, Defendant contends that the trial court erred in denying his request to defer the testimony of state expert Dr. Daniel Mar-tell until such time as he had prepared his written report and defense counsel had the opportunity to review the report with the aid of their experts. Specifically, Defendant asserts that he was given insufficient time to prepare for the cross-examination of Dr. Martell. The circumstances surrounding Dr. Martell’s evaluation and testimony are as follows. Dr. Martell, who lives in California, arrived in Nashville on March 14, 2000, and evaluated Defendant and his competency to stand trial that night. Dr. Martell had actually traveled to Nashville to participate in a deposition in an unrelated capital case. The trial court contacted the federal judge who was supervising the other matter and requested that the State be permitted to “borrow” Dr. Martell so he could present testimony in this case during a lunch break. Dr. Martell did not have time to prepare a written report of his findings prior to his testimony. As a result, defense counsel requested that Dr. Martell’s testimony be deferred until he could prepare a written report and counsel had been given adequate time to review the report with the aid of experts. The trial court refused to delay Dr. Martell’s testimony. In denying Defendant’s request, the court noted that exigent circumstances existed due to the filing of the competency motion so close in time to the selection of the jury. The court acknowledged that the defense did not have much time to prepare for Dr. Martell’s testimony, but stated that the State did not have much time to prepare either.
Defendant asserts that his counsel was not given an opportunity to investigate the evidence provided by Dr. Martell prior to its admission. Defendant notes that to provide effective representation, counsel must conduct appropriate factual and legal investigations. Nichols v. State, 90 S.W.3d 576, 587 (Tenn.2002); Baxter v. Rose, 523 S.W.2d 930, 932, 935 (Tenn.1975). While counsel was not provided with Dr. Mar-tell’s report prior to his testimony, counsel received Dr. Martell’s notes from the evaluation and met with Dr. Martell about his findings. Further, Defendant has not demonstrated any harm resulting from the court’s ruling on this issue. Given the unique circumstances surrounding Dr. Martell’s evaluation and testimony, we determine that the trial court did not abuse its discretion in denying a continuance of the competency hearing.
14. Testimony of Dr. Daniel Martell as expert in the field of psychology
Defendant contends that the trial court erred in allowing Dr. Martell to testify as an expert in the field of forensic neuropsychology because he is not licensed to practice psychology in the State of Tennessee. During cross-examination, defense counsel asked Dr. Martell if he had evaluated Defendant with regard to the issue of competency as a psychologist. Dr. Martell responded that he had. The trial court concluded, however, that Dr. Martell had performed a forensic evaluation of Defendant’s competence and had not engaged in the practice of psychology as defined by Tennessee Code Annotated Section 63-11-211(b)(5).
The Supreme Court addressed the same issue in Coe v. State, 17 S.W.3d 193 (Tenn.2000). The Supreme Court determined in that case that Dr. Martell had performed a forensic evaluation, which did not constitute the practice of psychology under Tennessee Code Annotated Section 63-11- *830 203(a) and therefore no authorization was required by Tennessee Code Annotated Section 63 — 11—211 (b)(5). Id. at 224-25. In reaching its decision, the Supreme Court explained that the only purpose of Dr. Martell’s evaluation was to determine whether Coe was competent. Dr. Mar-tell’s evaluation “was not for the purpose of ‘preventing or eliminating’ any psychological illness of [Coe] and ‘enhancing’ his mental health. Therefore, the performance of the forensic evaluation did not constitute the practice of psychology.” Id. at 225. The same is true in this case. Although Dr. Martell testified that his examination of Defendant was “the practice of psychology,” the purpose of Dr. Mar-tell’s examination of Defendant was to determine his competency to stand trial. The examination was not for the purpose of preventing or eliminating any psychological illness of Defendant and enhancing his mental health. See Tenn.Code Ann. § 63-ll-203(a) defining the “practice of psychologist.” Accordingly, Dr. Martell’s evaluation did not constitute the practice of psychology. The trial court did not err in allowing Dr. Martell to testify as an expert witness. Defendant is not entitled to relief on this issue.
15. Second court-ordered evaluation of defendant and monitoring by Dr. Farooque
Following testimony by Defendant’s expert, the State’s expert, and the court-appointed mental health expert at the competency hearing, the court ordered a second evaluation of Defendant. The court found the testimony of the three experts to be conflicting and determined that a second evaluation of Defendant by a court-appointed expert was necessary. The court based its reasoning in part on the fact that it questioned the credibility of Dr. Caruso, the independent expert it had previously appointed.
Dr. Caruso’s written report stated that he had to remind Defendant during his evaluation that the insanity defense was available to him. However, Defendant was being evaluated for the purposes of competency to stand trial, not insanity at the time of the crimes. Following his testimony, Dr. Caruso sent a fax to the court explaining that he may have unintentionally misstated Defendant’s knowledge of his charges in his report and in his testimony before the court. The court found that Dr. Caruso’s report lacked credibility due to the fact that his finding that Defendant was unaware of the charges against him could not be verified by the tape recordings Dr. Caruso made, as the tape recorder had malfunctioned during that portion of the interview. Additionally, the court questioned Dr. Caruso’s credibility because he submitted a bill to the court in an amount of $20,250 for his evaluation of Defendant, when he had agreed to accept a fee of $7,500.
Tennessee Code Annotated Section 33-7-301 sets forth the procedure a court must undertake in appointing a competency expert. The Code, however, sets forth no procedure for the court to follow when it questions the credibility of the expert it has appointed under the Code. It is quite obvious that the court questioned the credibility of the expert it had appointed. Defendant asserts that because Tennessee Code Annotated Section 33-7-301 does not specifically provide that the court may order a second evaluation, the court erred in doing so. However, we cannot agree.
Given the circumstances of this case, we find it was within the trial court’s discretion to order a second evaluation. Defendant surmises that the court ordered the second evaluation because the court did not approve of the opinion given by Dr. Caruso. However, the court explained *831 that it had absolutely no interest in trying any incompetent defendant, especially one whose life was at stake. The court, however, felt it was necessary for Defendant to undergo a second evaluation, given the conflicting testimony by the three experts. Moreover, Dr. Caruso had opined that although he believed Defendant was currently incompetent, he may become competent with the use of medication. Therefore, the court instructed that the second evaluation include recommendations regarding the need for medication. Given these circumstances and the fact that the court questioned the credibility and accuracy of the court-appointed expert, the court did not err in ordering a second evaluation of Defendant.
Similarly, Defendant argues that the trial court erred in designating Dr. Rokeya Farooque to monitor Defendant’s competency following the competency hearing. Defendant submits that the trial court had no legal authority to appoint an independent evaluator after it appointed Dr. Caruso. However, as set forth above, given the circumstances of this case, we find no error in the continued monitoring of Defendant by Dr. Farooque and the MTMHI forensic staff. As the trial court explained in its order denying Defendant’s motion for new trial, the court had not had any discussions with Dr. Caruso concerning continued monitoring of Defendant following the competency hearing. Although Dr. Caruso had agreed to evaluate Defendant for a fee of $7,500, he sent a request for payment on the amount of $20,250. As a result, the trial court determined that it should not employ a private psychiatrist when a qualified forensic team from a state hospital was available. Defendant has failed to set forth any prejudice that resulted from the trial court’s order that Dr. Farooque monitor Defendant’s competence throughout trial.
Defendant is not entitled to relief on this issue.
16. Rebuttal testimony of Dr. Caruso
Defendant submits that the trial court erred in refusing to allow Dr. Caruso to offer rebuttal testimony following the testimony by the evaluation team as to its evaluation of Defendant. However, the court allowed Dr. Auble, Defendant’s designated expert, to testify on rebuttal. Moreover, the court had stated in open court and through its written orders that it questioned the credibility and accuracy of Dr. Caruso and his findings.
The issue of whether to allow rebuttal testimony, as well as the scope of that testimony, lies within the sound discretion of the trial court. State v. Thompson, 43 S.W.8d 516 (Tenn.Crim.App.2000). The court’s ruling on this issue will not be overturned absent a clear abuse of discretion. State v. Kendricks, 947 S.W.2d 875, 884 (Tenn.Crim.App.1996). The trial court found that Defendant was not prejudiced by the court’s refusal to allow the rebuttal testimony of Dr. Caruso, and Defendant has failed to show on appeal how he was prejudiced by the court’s ruling that Dr. Caruso could not testify in rebuttal to the testimony of the evaluation team from MTMHI. After a review of the record, we cannot determine that the trial court abused its discretion in refusing to allow Dr. Caruso to testify on rebuttal at the competency hearing. Defendant is not entitled to relief on this issue.
17. [Deleted: Competency of Defendant to stand trial]
18. Defense counsel’s motion to withdraw
Following the competency hearing, defense counsel moved for withdrawal of fur *832 ther representation of Defendant. Defense counsel asserted that they could not effectively represent Defendant because he did not trust them and believed that they were trying to kill him. The trial court denied the motion. The trial court noted that Defendant’s main complaint with his attorneys was that they had focused too much time on the competency and penalty phases, rather than the guilt phase. The court determined that any attorneys in their stead would pursue the same strategy. The court also noted that it was not uncommon for defendants to disagree and be dissatisfied with their attorneys. The court pointed out that Defendant’s attorneys were very well acquainted with the facts of the case and Defendant’s mental health and family history. Accordingly, the court found that Defendant’s current attorneys were uniquely qualified to represent Defendant in this capital murder trial. The court determined that the replacement of Defendant’s attorneys was not warranted and denied the motion.
Tennessee Code Annotated Section 40-14-205 provides that the court may allow an appointed attorney to withdraw upon good cause shown. The trial court’s decision on withdrawal in a pending criminal matter rests within the sound discretion of the trial court and will not be reversed on appeal absent an abuse of discretion. State v. Branam, 855 S.W.2d 563, 566 (Tenn.1993); State v. Russell, 10 S.W.3d 270, 274 (Tenn.Crim.App.1999). At the time of Defendant’s trial, Tennessee’s Code of Professional Responsibility was in effect. See Tenn. S.Ct. R. 8 (2000). Under the Code of Professional Responsibility, mandatory withdrawal of an attorney from representation is required when:
(1)The lawyer knows or it is obvious that the client is bringing the legal action, conducting the defense, or asserting a position in the litigation, or is otherwise having steps taken for the client, merely for the purpose of harassing or maliciously injuring any person.
(2) The lawyer knows or it is obvious that continued employment will result in violation of a Disciplinary Rule.
(3) The lawyer’s mental or physical condition renders it unreasonably difficult for the lawyer to carry out the employment effectively.
(4) The lawyer is discharged by his client.
Tenn. S.Ct. R. 8, DR 2-110(B). None of the instances requiring mandatory withdrawal is present in this case. Accordingly, mandatory withdrawal was not required. Defendant asserts, however, that permissive withdrawal was warranted by DR 2-110(C)(l)(d), which provides that counsel may request withdrawal because the client “[b]y other conduct renders it unreasonably difficult for the lawyer to carry out the employment effectively.” Tenn. S.Ct. R. 8, DR 2-110(C)(l)(d). On appeal, Defendant contends that his relationship with his attorneys was compromised to a degree that made counsel’s effective representation of him impossible. As a result, Defendant contends that the trial court erred in denying counsel’s motion to withdraw. We conclude, however, that the trial court did not err in denying counsel’s motion to withdraw, given the circumstances of this case.
In this case, the court found that counsel were uniquely qualified to represent Defendant. The Tennessee Supreme Court has stated that “[t]he advantage of familiarity with [a] case will generally outweigh any possible advantages to be gained in the fresh viewpoint of successor counsel.” Parton v. State, 2 Tenn.Crim.App. 626, 455 S.W.2d 645, 650 (1970). Defense counsel’s motion to withdraw was made with two weeks remaining until jury *833 selection was set to begin. Defendant would have been adversely affected if the court had allowed withdrawal of counsel at such a late date. Moreover, as the trial court noted, the appointment of new counsel would not have resolved the issues Defendant had with his attorneys concerning what he believed was his best trial strategy.
We further note that subsequent to Defendant’s trial, Tennessee adopted the Rules of Professional Conduct. See Tenn. S.Ct. R. 8, RPC (2003). Under the Rules of Professional Conduct, withdrawal of representation by counsel is mandatory where continued representation will result in a violation of the Rules of Professional Conduct or other law, where counsel’s physical or mental condition materially affects his ability to represent the client, or where counsel is discharged by the client. Tenn. S.Ct. R. 8, RPC 1.16. Further, counsel may withdraw from representation of a client if the withdrawal can be accomplished without material adverse effect on the interests of the client, or if: the client persists in a course of action that the lawyer reasonably believes is criminal or fraudulent; the client uses the lawyer’s services to perpetrate a crime or fraud; the client insists upon pursuing an objective that the lawyer considers repugnant or imprudent; the client fails substantially to fulfill an obligation to the lawyer regarding the lawyer’s services and the client has been given reasonable warning that the lawyer will withdraw unless the obligation is fulfilled; the representation will result in an unanticipated and substantial financial burden on the lawyer or has been rendered unreasonably difficult by the client; other good cause for withdrawal exists; or the client agrees to the withdrawal of the lawyer in writing. Id. The Rules of Professional Conduct were not in effect until March 1, 2003, and thus were not applicable at the time of Defendant’s trial. However, we determine that even if this case were remanded for a new trial and tried under the new Rules of Professional Conduct, mandatory withdrawal would not be required, given the same set of circumstances. Moreover, permissive withdrawal of defense counsel in this instance would have resulted in a material adverse effect on the interests of Defendant. Accordingly, assuming arguendo that it was error on the part of the trial court to deny counsel’s motion to withdraw, such error would be harmless in light of the new Rules of Professional Conduct. A new trial would not give Defendant any benefit. As the trial court noted, appointment of new counsel would not have resolved the issues Defendant had with defense counsel. As a result of the foregoing, the trial court did not abuse its discretion in denying defense counsel’s motion to withdraw.
19. “Religious tests” in voir dire
Defendant contends that the exclusion of jurors who express religious objections to the death penalty constitutes a religious test, which is prohibited by Article I, Section 6 of the Tennessee Constitution. Defendant filed a motion to prohibit the use of this “religious test,” which the trial court denied. Defendant acknowledges that the Tennessee Supreme Court has held that the exclusion of jurors who express religious objections to the death penalty is not a religious test, per se, citing State v. Jones, 789 S.W.2d 545, 547 (Tenn.1990).
Moreover, the Supreme Court affirmed this court’s holding in defendant’s prior appeal of the Captain D’s murders in State v. Reid, that the exclusion of prospective jurors by a trial court because of their moral or religious based reluctance to im *834 pose the death penalty is not error. State v. Reid, 91 S.W.3d 247, 289-90 (Tenn.2002). “In this regard, potential jurors are removed for cause not because of their religious opinion or affiliation but because the jurors are unable to view the proceedings impartially and perform their duties in accordance with the juror’s oath.” Id. at 290. Questioning of a juror with regard to the death penalty does not amount to a religious test. Id. (citing Wolf v. Sund-quist, 955 S.W.2d 626, 631 (TenmApp.), perm. app. denied, (Tenn.1997)). Defendant acknowledges that the Tennessee Supreme Court has rejected this argument, but makes the argument in order to preserve it for later review. See State v. Gomez, 163 S.W.3d 632, 651 (Tenn.2005) (“Indeed, a defendant is never precluded from raising an issue simply because a prior decision has rejected it.”). Defendant is not entitled to relief on this issue.
20. Instruction to venire that some aggravating factors relate to circumstances of the victim
Defendant contends that the trial court erred when it stated to the first panel of potential jurors, in giving general instructions about the nature of a capital case, that aggravating circumstances are specifically defined by the legislature and “relate to circumstances about the crime or circumstances about the victim.” Defendant asserts that this statement could have misled the jury into believing that victim impact evidence constituted an aggravating circumstance. Defendant admits that several of the aggravating circumstances relate to circumstances of the victim. However, Defendant submits that the court must state the law fully and accurately, and this statement by the court may have misled the jury. Defendant further admits that the trial court later properly instructed the jury that victim impact evidence is not the same thing as an aggravating circumstance. However, Defendant submits that the proper instruction only served to heighten the jury’s confusion.
Defendant failed to enter a contemporaneous objection to the trial court’s statement; therefore, this issue is waived for purposes of appeal. Tenn. R.App. P. 36(a). Moreover, in the same general instruction to the panel of potential jurors, the trial court instructed the jury that they must rely on the aggravating circumstances delineated by the legislature, that they could not make up their own aggravating circumstances, that the court would tell them what the potential aggravating circumstances were, that they would have to unanimously agree that the aggravating circumstances existed, and they would have to agree that the aggravating circumstances existed beyond a reasonable doubt. This court cannot determine that the trial court’s statement misled the jury. Defendant is not entitled to relief on this issue.
21. Questioning of potential juror regarding her opinion of mental health as mitigation evidence in the case of State v. Coe
Defendant next contends that the trial court erred in refusing to allow questioning of a potential juror on her opinion as to whether she believed it was proper for the attorneys who had represented capital defendant Robert Glen Coe to claim that he was mentally incompetent as a defense to his impending execution. In response to the question, the potential juror responded: “I didn’t think anything about that because I didn’t know anything about that.” The State then objected to further questioning on the grounds of relevancy. The court sustained the objection.
*835 Defendant contends that as a result of the court’s limitation on questioning of the potential juror, Defendant was not able to conduct the voir dire in such a manner that would enable him to determine if a potential juror would consider, in good faith, the mitigating circumstance of mental health. However, the court did not limit counsel’s ability to question the potential juror on whether she would consider mental health as a mitigating circumstance. Instead, the court refused to allow questioning of the juror on a subject about which the juror had advised she had no knowledge. The court’s limitation on defense counsel’s questioning of the juror about her knowledge and opinion of the Coe case did not impede Defendant’s ability to determine if the potential juror would consider, in good faith, the mitigating circumstance of mental health.
The control of voir dire proceedings rests within the sound discretion of the trial court, and this court will not interfere with the exercise of this discretion unless clear abuse appears on the face of the record. State v. Howell, 868 S.W.2d 238, 247 (Tenn.1993), cert. denied, 510 U.S. 1215, 114 S.Ct. 1339, 127 L.Ed.2d 687 (1994). Defendant has failed to demonstrate an abuse of discretion by the trial court on this issue, and therefore is not entitled to relief on this issue.
22. Failure to excuse juror Judy Reynolds for cause
Defendant asserts that the trial court should have excluded juror Judy Reynolds for cause. In response to the juror questionnaire, Ms. Reynolds stated that she strongly favored the death penalty and that she would have difficulty in imposing a sentence of life or life without the possibility of parole in a murder case. Ms. Reynolds explained that if a person was in his right mind and knew what he was doing, then she would be in favor of imposing the death penalty. However, she also explained that she would listen to the facts of the case, and if the aggravating factors did not outweigh the mitigating factors, she could consider both the sentences of life and life without the possibility of parole. She further explained that she could follow the law and her oath as a juror.
Defense counsel also asked Ms. Reynolds about her views on the death penalty, and she again explained that she was in favor of the death penalty. However, upon further questioning by defense counsel, Ms. Reynolds stated that she would consider mitigating factors in making a decision on the appropriate sentence and would consider the sentences of life and life without the possibility of parole. In response to questioning by the State, Ms. Reynolds again confirmed that she would listen to all of the evidence, weigh both aggravating and mitigating circumstances, and consider sentences of life and life without the possibility of parole. Defense counsel did not challenge juror Reynolds immediately following her individual voir dire. However, the defense did later challenge Ms. Reynolds. At that time, the trial court denied the challenge for cause. The trial court ruled that Ms. Reynolds could follow her oath as a juror and determined that Ms. Reynolds would be an appropriate juror for the case.
In determining when a prospective juror may be excused for cause because of his or her views on the death penalty, the standard is “whether the juror’s views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.” State v. Austin, 87 S.W.3d 447, 472-73 (Tenn.2002) (citing Wainwright v. Witt, 469 U.S. 412, 424, 105 S.Ct. *836 844, 83 L.Ed.2d 841 (1985)). “[T]his standard likewise does not require that a juror’s biases be proved with ‘unmistakable clarity.’ ” Id. at 473. However, the trial judge must have the “definite impression” that a prospective juror could not follow the law. State v. Hutchison, 898 S.W.2d 161, 167 (Tenn.1994) (citing Wainwright v. Witt, 469 U.S. at 425-26, 105 S.Ct. at 853). Finally, the trial court’s finding of bias of a juror because of his or her views concerning the death penalty are accorded a presumption of correctness, and the defendant must establish by convincing evidence that the trial court’s determination was erroneous before an appellate court will overturn that decision. State v. Alley, 776 S.W.2d 506, 518 (Tenn.1989), cert. denied, 493 U.S. 1036, 110 S.Ct. 758, 107 L.Ed.2d 775 (1990).
After reviewing the answers and responses of Judy Reynolds, we conclude that the trial court did not err in failing to exclude her for cause. Ms. Reynolds was extensively questioned as to whether she could apply the law to the evidence and consider all forms of punishment in this case. She responded that she would be able to do so. Defendant is not entitled to relief on this issue.
23. Questioning of prospective jurors as to whether they believed the death penalty is a “moral function” of the government
During voir dire, the State asked potential jurors if they believed the death penalty was an “appropriate and moral function of the government in certain first degree murder cases as set out by law.” Defendant contends that the trial court erred in allowing this question to be asked because the question implies that a juror who will not return a death sentence is immoral. However, Defendant did not object to this question. Accordingly, Defendant has waived appellate consideration of this issue. See State v. Thornton, 10 S.W.3d 229, 234 (Tenn.Crim.App.1999) (citing Tenn.R.App. P. 36(a)); State v. Green, 947 5.W.2d 186, 188 (Tenn.Crim.App.1997). Moreover, the scope and extent of voir dire is entrusted to the discretion of the trial court, and a trial court’s rulings will not be reversed on appeal absent an abuse of discretion. State v. Smith, 993 S.W.2d 6, 28 (Tenn.1999). Defendant has failed to show an. abuse of discretion by the trial court; therefore, he is not entitled to relief on this issue.
24. Questioning of prospective jurors regarding what they had learned about eyewitness identification from watching television
During the group voir dire in this case, defense counsel attempted to ask a member of the panel what he had learned about eyewitness identification from watching television shows. The defense had included a similar question on the juror questionnaire. The State objected to the question during voir dire, and the court sustained the objection. In making its ruling, the court explained that the question was irrelevant to the potential juror’s qualification to sit on the jury. The court further explained that the defense’s question could elicit responses that would taint the entire panel. The trial court noted in its order denying the motion for new trial that “[t]he relevant inquiry was whether, regardless of each juror’s personal knowledge concerning [eyewitness identification] evidence, he or she could objectively listen to and evaluate it during this trial.”
Rule 24(a) of the Tennessee Rules of Criminal Procedure provides that the trial court “shall permit questioning by the parties for the purposes of discovering bases *837 for challenge for cause and enabling an intelligent exercise of peremptory challenges.” As previously set forth, however, the scope and extent of voir dire is entrusted to the discretion of the trial court, and a trial court’s rulings will not be reversed on appeal absent an abuse of discretion. Smith, 993 S.W.2d at 28.
The trial court allowed the defense to inquire about the potential jurors’ knowledge of eyewitness identification on the questionnaire. Moreover, the court allowed counsel to ask potential jurors if they had learned anything outside of the courtroom that would affect their ability to consider eyewitness testimony fairly and impartially. Defense counsel also asked the panel numerous questions on the issue of eyewitness identification. Defendant asserts that by asking the potential juror what he had learned through watching television shows, counsel was merely attempting to make sure that the juror had not viewed programs that depicted eyewitness identifications as infallible or immune from error. After a review of the voir dire, we conclude that defense counsel was not restricted from asking about whether potential jurors believed or had learned from an outside source that identifications are infallible or immune from error. In fact, defense counsel announced to the panel that she wanted to ask a general question, which she stated as follows: “Is there anybody here who believes that people never make mistakes in recognizing other people? Is there anybody here who believes that?” No one from the panel responded affirmatively. The trial court’s refusal to allow questioning of a potential juror as to his viewing of a television show that included the subject of eyewitness identification was not error. Defendant has failed to show that the trial court erred in this ruling, and is therefore not entitled to relief on this issue.
25. Questioning of witness Jose Gonzales regarding the color of the perpetrator’s gun
Witness Jose Gonzales required the use of an interpreter at trial. Mr. Gonzales, a Spanish speaking native of Mexico, was assisted by an interpreter from Puerto Rico. During the State’s case-in-chief, the prosecutor questioned Gonzales about the color of the gun used during the homicides. Gonzales, through his interpreter, responded that the gun was a “gold-type color.” The prosecutor asked two follow up questions, inquiring as to whether the gun was shiny like gold or had a gold tint. Each time, Gonzales responded that it was a gold or gold-like color. The prosecutor subsequently asked the interpreter to ask Gonzales to describe the difference in silver and gold. At that point, the defense objected, arguing that the question of the color of the gun had been asked and answered. The prosecutor explained that he believed there might be a problem in the translation between the Mexican witness and the Puerto Rican interpreter. The prosecutor stated he wanted to ask one clarifying question. The judge then allowed the following question: “Could you ask, the question is, what is silver in Mexico; what is silver in Mexico versus gold in Mexico?” Gonzales responded: “I call silver a gold color.”
Defendant contends that the issue of the color of the gun was crucial because witness Robert Bolin testified that the gun he had sold to Defendant was “nickel-plated.” Defendant asserts that Gonzales did not refer to the color silver until the State suggested the proper answer in its question. Accordingly, Defendant contends that the trial court erred in allowing the *838 repetitive questioning regarding the color of the gun.
It is the longstanding principle that the “propriety, scope, manner and control of examination of witnesses is within the trial court’s discretion and will not be interfered with in the absence of an abuse of discretion.” State v. Harris, 839 S.W.2d 54, 72 (Tenn.1992). In the order denying the motion for new trial, the trial court explained that Gonzales had previously expressed concern that his thoughts were not being accurately conveyed at times due to variations among the dialects of his Spanish speaking interpreters. Moreover, this court cannot conclude that the trial court’s allowance of a clarifying question results in prejudicial error, especially in light of the fact that the defense fully cross-examined Gonzales and highlighted his previous testimony that the color of the gun was a golden color. Defendant has failed to show an abuse of discretion by the trial court. Defendant is not entitled to relief on this issue.
26. Admission of photograph of defendant
Exhibit 2 to Defendant’s trial is a photograph of Defendant standing in front of a black automobile. In the photograph, Defendant is wearing a pair of black tennis shoes. Witness Jose Gonzales testified that the shoes worn by Defendant in the photograph were similar to the shoes he wore on the night of the robbery and murders at McDonald’s. The photograph was admitted over the objection of the defense. Specifically, the defense contended at trial and contends on appeal that the photograph should not have been admitted into evidence because the photograph does not clearly depict a pair of shoes, and the admission of the photograph was, therefore, error. Defendant further argues that the photograph should have been excluded pursuant to Tennessee Rule of Evidence 403, which reads: “Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.” Defendant argues that the photograph at issue is not admissible because it does not clearly depict a pair of shoes, and that, even if it did, there was no way that Gonzales could state with certainty that the shoes in the photograph were the same shoes worn by the perpetrator.
It is within a trial court’s discretion to admit photographic evidence at trial, and this court will not reverse the trial court’s determination absent an abuse of discretion. State v. Banks, 564 S.W.2d 947, 949 (Tenn.1978). However, before a photograph may be admitted into evidence, the relevance of the photograph must be established, and the probative value of the photograph must outweigh any prejudicial effect. State v. Braden, 867 S.W.2d 750, 758 (Tenn.Crim.App.1993). We conclude that the photograph was relevant to the description of Defendant on the night in question, and we further determine that the admission of the photograph was not outweighed by any prejudicial effect. The photograph at issue is a clear depiction of Defendant wearing a pair of black tennis shoes. We cannot determine that the trial court erred in allowing the admission of the photograph. Defendant has failed to show that the photograph was' not relevant to Gonzales’ description of Defendant or that the admission of the photograph was error under Rule 403. Defendant is not entitled to relief on this issue.
*839 27. Impeachment of witness Gonzales with transcript of preliminary hearing
Defendant contends that the trial court committed reversible error when it denied defense counsel’s request to impeach Gonzales with his testimony at the preliminary hearing. At the preliminary hearing, Gonzales testified that Defendant’s hair was black and it came out of the baseball cap he was wearing on both the sides of the cap and in the back. During Gonzales’ cross-examination at trial, he testified that the man at the restaurant on the night in question had hair coming out of the sides of the baseball cap. He further testified that he did not recall having said that the perpetrator’s hair extended from the back of the cap and that as he recalled, the hair was only coming out from the sides of the cap. The defense, however, had Gonzales view the composite sketch, and Gonzales admitted that he had assisted the police in the formulation of the sketch. Gonzales admitted that the man pictured in the sketch had hair coming out of the back of the baseball cap. Moreover, defense counsel asked: “But you did see hair coming out of the back of the head,” and Gonzales responded: “Yes, coming out of the baseball cap.” Thereafter, the defense requested that it be permitted to cross-examine Gonzales with his testimony at the preliminary hearing. The defense specifically requested that it be permitted to show the transcript to Gonzales to show him exactly what his testimony had been at the preliminary hearing. The trial court denied the request.
In denying defense counsel’s request, the court explained that the transcript was produced in English, and it had not been established that Gonzales could read English. Moreover, there was not a verbatim transcription of Gonzales’ words at the preliminary hearing. Instead, there was a transcription of the interpreter’s translation of what Gonzales said.
The propriety, scope, manner and control of cross-examination of witnesses lies within the discretion of the trial court. State v. Dishman, 915 S.W.2d 458, 463 (Tenn.Crim.App.1995) (citing Coffee v. State, 188 Tenn. 1, 4, 216 S.W.2d 702, 703 (1948); Davis v. State, 186 Tenn. 545, 212 S.W.2d 374, 375 (1948)). This court will not disturb the limits placed upon the cross-examination by the trial court, unless the trial court has unreasonably restricted the right. Id. (citing State v. Fowler, 213 Tenn. 239, 253, 373 S.W.2d 460, 466 (1963); State v. Johnson, 670 S.W.2d 634, 636 (Tenn.Crim.App.1984)). We cannot conclude that the trial court unreasonably restricted the cross-examination of Gonzales when it denied the defense’s request to impeach him with his testimony at the preliminary hearing. As the trial court noted, there was no proof that the witness would have been able to read the English transcript to either confirm or deny that he made the statement as set forth in the transcript. Moreover, Gonzales admitted during cross-examination by the defense that the composite sketch depicted the perpetrator with hair coming out of the back of the baseball cap. He also admitted that he saw hair coming out of “the back of the head.” Defendant has failed to show that he was prejudiced by the court’s denial of cross-examination of Gonzales with the use of the preliminary hearing testimony. Defendant is not entitled to relief on this issue.
28. Re-cross Examination of witness Gonzales
On redirect examination of witness Gonzales, the State questioned Gonzales about the length of Defendant’s hair on the night of the murders as opposed to the length of *840 his hair the first time he saw Defendant in court after his arrest. During re-cross by the defense, counsel attempted to introduce a photograph of Defendant for the purpose of asking if Defendant’s hair in the photograph is different from the hair of the man Gonzales encountered at McDonald’s on the night of the robbery and murders. The trial court denied Defendant’s request to cross-examine Gonzales with the photograph. The trial court ruled that such questioning of Gonzales was not proper for re-cross examination. The court further advised that counsel could have introduced the photograph during its cross-examination of Gonzales. The trial court explained that the prosecutor’s redirect examination of Gonzales regarding the length of Defendant’s hair on the night in question and in court did not open the door for the questioning and introduction of the photograph as proposed by defense counsel.
As set forth supra the propriety, scope, manner and control of cross-examination of witnesses lies within the discretion of the trial court, and this court will not disturb the limits placed upon the cross-examination, unless the trial court has unreasonably restricted the right. State v. Dishman, 915 S.W.2d at 463. Defendant has not shown how he was prejudiced by the trial court’s ruling on this issue. Further, after a review of the record before us, we cannot conclude that the trial court committed reversible error in its refusal to allow the questioning and introduction of the photograph as requested by Defendant. Defendant is not entitled to relief on this issue.
29. Crime scene video
Defendant contends that the trial court erred in admitting into evidence the videotape of the crime scene. Defendant contends that the videotape was cumulative of testimony of other witnesses. Specifically, defendant contends that the videotape was not necessary to establish the position of the bodies or the description of the crime scene. Defendant further contends that the depiction of the crime scene in the videotape was “gruesome and graphic” and thus prejudicial. Defendant submits that the only purpose of the video was to inflame and prejudice the jury against him.
The admissibility of a videotape of a crime scene is within the sound discretion of the trial judge, and his or her ruling on admissibility will not be disturbed on appeal absent a clear showing of an abuse of that discretion. State v. Carruthers, 35 S.W.3d [516] at 576-57 [ (Tenn.2000)], cert. denied, 533 U.S. 953, 121 S.Ct. 2600, 150 L.Ed.2d 757 (2001); State v. Banks, 564 S.W.2d 947, 949 (Tenn.1978); see also State v. Van Tran, 864 S.W.2d 465, 477 (Tenn.1993), cert. denied, 511 U.S. 1046, 114 S.Ct. 1577, 128 L.Ed.2d 220 (1994). As the Supreme Court stated in Carruthers, the modern trend is to vest more discretion in the trial judge’s rulings on admissibility. Carruthers, 35 S.W.3d at 577 (citing State v. Banks, 564 S.W.2d at 949; State v. Bailey, No. 01C01-9403-CC-00105, 1995 WL 424996 (Tenn.Crim.App., Nashville, July 20, 1995); perm. app. denied, (Tenn. Jan. 8,1996)).
Evidence is relevant if it has “any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.” Tenn. R. Evid. 401. However, relevant evidence “may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury.” Tenn. R. Evid. 403. Prejudicial evidence is not excluded as a matter of law. Carruthers, 35 S.W.3d at 577 (citing State v. Gentry, 881 *841 S.W.2d 1, 6 (Tenn.Crim.App.1998)). The court must still determine the relevance of the visual evidence and weigh its probative value against any undue prejudice. Id. The term “undue prejudice” has been defined as “[a]n undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one.” Banks, 564 S.W.2d at 950-51.
In Banks, the Supreme Court gave the trial courts guidance for determining the admissibility of relevant photographic evidence. A trial court should consider: the accuracy and clarity of the picture and its value as evidence; whether the picture depicts the body as it was found; the adequacy of testimonial evidence in relating the facts to the jury; and the need for the evidence to establish a prima facie case of guilt or to rebut Defendant’s contentions. Banks, 564 S.W.2d at 951. In this case, the trial court found that the video was relevant to show the position of the victims, to give an accurate description of the crime scene, to corroborate the testimony of Gonzales, to show the location of the victims’ hats, to show the location of the shell casings, and to show intent. The court further found that the probative value of the videotape was not substantially outweighed by the danger of unfair prejudice. Defendant advances the argument that the video was graphic and gruesome, but the only contention he makes in this regard is that the video shows the bloody bodies of the victims as they were found at the crime scene and items left behind by medical personnel who rendered aid to Brown and Gonzales before transporting them to the hospital. The crime scene video of most homicides will necessarily depict the bodies of the victims as they were found and the blood of the victims. If this court were to accept defendant’s argument in this regard, no crime scene videotapes of murders would ever be admissible.
This court further concludes that while the videotape and the other evidence admitted in this case may have contained some of the same material, it was not error to admit the videotape. See State v. Bigbee, 885 S.W.2d 797, 807 (Tenn.1994), holding that it was not error to admit a videotape of the crime scene although it depicted images similar to those of photographs also admitted. Each of the different forms of evidence admitted in this case served different purposes and were probative of the issues to be decided by the jury. As a result, the trial court did not abuse its discretion in admitting the videotape into evidence. See id.; see also State v. Lee, No. 02C01-9608-CC-00085, 1997 WL 686258, *9 (Tenn.Crim.App., Jackson, Nov. 5, 1997), perm. app. denied, (Tenn. Aug. 3, 1998). The probative value of the video of the crime scene is not outweighed by the danger of any unfair prejudice.
Defendant is not entitled to relief on this issue.
30. Photograph of crime scene
Defendant moved pretrial to exclude all still photographs of the crime scene. The court denied the motion, ruling that prior to the introduction of any photograph the State must give notice so that a hearing could be held outside the presence of the jury to determine admissibility. At trial, the court allowed the State to introduce a still photograph of the crime scene, which depicts blood at the scene and bloody footprints. Defendant contends that the admission of this photograph was error.
As set forth supra, it is within the trial court’s discretion to admit photographic evidence at trial, and this court will not reverse the trial court’s determination absent an abuse of discretion. Banks, 564 *842 S.W.2d at 949. In its order denying the Defendant’s motion for new trial, the court found that the photograph was not particularly gruesome, it assisted paramedic Randy Stratton with his testimony that the area where Jose Gonzales was found was small and there was virtually no way for paramedics to attempt to save Gonzales’ life without contaminating the scene, it was relevant to the State’s theory that unidentified bloody prints discovered at the scene were likely those of emergency personnel as opposed to the perpetrator, and its relevance was not substantially outweighed by the danger of unfair prejudice.
After a review of the record, we conclude that the trial court did not err in allowing the introduction of the photograph. While it depicts blood at the scene, we conclude that the photograph is not particularly gruesome. Moreover, we also agree that the photograph assisted witness Randy Stratton in his testimony. The probative value of the photograph is not substantially outweighed by the danger of unfair prejudice. Accordingly, Defendant is not entitled to relief on this issue.
31. Photographs of defendant with various hair lengths
During the testimony of Detective Posti-glione, the State submitted for evidence a collection of photographs that depicted Defendant with various hair lengths. Defendant contends that the admission of the photographs was error because some of the photographs dated back to 1996 and, therefore, were not relevant to the time period at issue, spring and summer of 1997. Defendant further contends that the State offered proof that Defendant had altered the length of his hair during the relevant time period. Therefore, Defendant asserts that the admission of this cumulative evidence was irrelevant.
The trial court determined in its order denying the motion for new trial that the exact length of the Defendant’s hair at the time in question was unknown. Therefore, through the photographs, the State “invited the jurors to observe the defendant’s appearance with hat of various lengths and decide if his appearance could have been consistent with that of the perpetrator.” The court specifically found that the probative value of the photographs was not outweighed by the danger of unfat prejudice.
After reviewing the photographs, the record in general, and Defendant’s arguments, we cannot conclude that the trial court erred in allowing the collection of photographs to be introduced into evidence. The photographs were relevant to the issue of Defendant’s appearance as compared to that of the perpetrator. Defendant has failed to show how the relevance of the photographs were substantially outweighed by the danger of unfair prejudice. Further, Defendant has failed to demonstrate that the trial court abused its discretion in permitting the photographs to be admitted. Accordingly, this court cannot reverse the trial court on this issue. See Banks, 564 S.W.2d at 949.
32. Questioning of witness Robert Bo-lin
Robert Bolin, whose father lived in the same boarding house as Defendant, testified that in January 1997, Defendant asked him to obtain a .25 automatic handgun. Defendant advised that he wanted the handgun for his personal protection. Bolin explained that he was a truck driver and met Defendant through his father. Mr. Bolin sold Defendant two .25 automatic handguns during January 1997. The first handgun was a Davis .25 automatic, which Bolin described as nickel-plated with black handle grips. After selling Defen *843 dant the first handgun, Bolin testified that Defendant requested another handgun. The second handgun was also a .25 automatic, which was nickel-plated with pink handles. Further, Mr. Bolin testified that he gave Defendant a box of ammunition that came in a green and yellow box, but he could not recall the brand of the ammunition.
During the cross-examination of witness Robert Bolin, the defense asked Bolin if there had been extensive media coverage of the McDonald’s murders in Nashville. Bohn responded that he assumed there had been, but because he drove a truck, he was not in Nashville a lot. The defense then sought to ask Mr. Bolin if he had ever seen the composite sketch of the perpetrator and if so, if he believed the sketch resembled Defendant. The trial court instructed the defense not to ask the question because counsel did not know the response to the question, and it was possible that his response might include a reference to one of the Defendant’s other trials, which would cause a mistrial. The trial court concluded that any probative value of the response was “greatly outweighed by the possibility that Bohn would cause a mistrial by mentioning the unrelated murders.” Defendant submits that the trial court should have allowed a jury-out hearing on the issue, but he did not make such a request at trial.
The trial court ruled pre-trial that no mention of Defendant’s previous cases could be referenced at this trial. Accordingly, the court appears to have had concerns that the questioning regarding the media’s extensive coverage of the McDonald’s murders could lead into the witness’s discussion of the media coverage in the Captain D’s and Baskin Robbins’s murders. The trial court ultimately concluded that the questioning was excluded by Rule of Evidence 403. Rule of Evidence 403 excludes evidence if the probative value of the evidence is “substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.” Tenn. R. Evid. 403. Defendant did not request a jury-out hearing to make an offer of proof on this issue; therefore, the answer to defense counsel’s question of whether Bo-lin had seen the sketch remains a mystery. Further, counsel expressed interest in knowing whether Bolin believed the sketch looked like Defendant. Again, however, no offer of proof was made; therefore, the question remains unanswered. In the absence of an offer of proof on this issue, Defendant cannot show that he was prejudiced by the trial court’s ruling. Accordingly, we conclude that any error by the trial court on this issue was harmless. See Tenn. R.Crim. P. 52(a). Defendant is not entitled to relief on this issue.
33. Testimony of Bernie Billingsley
Bernie Billingsley testified that he became acquainted with Defendant in early 1997, while working out at Hermitage Fitness Center. He testified that in March 1997, after Defendant overheard him talking with other members of the fitness club about the stock market, Defendant approached him for financial advice. Defendant advised that he had $3,000 he wanted to invest and asked Mr. Billingsley’s advice on how he should invest the money. Mr. Billingsley advised that he should invest the money in a mutual fund. When he saw Defendant a few weeks later, Defendant advised that he had invested the money in a mutual fund.
Defendant contends that the trial court erred in permitting Billingsley’s testimony because it impermissibly reflects upon De *844 fendant’s financial condition. We have previously concluded that the trial court did not err in permitting the limited proof of Defendant’s financial condition. We further hold that the trial court did not err in permitting the testimony of Mr. Bill-ingsley, as it was relevant to show that although Defendant had been unemployed since February, he had either acquired or intended to acquire $3,000 and was seeking advice on how to invest the money. The relevance of this testimony was not outweighed by the danger of unfair prejudice. See Tenn. R. Evid. 403.
Defendant is not entitled to relief on this issue.
34. Trial court’s refusal to instruct jury that it could convict defendant of premeditated murder or felony murder, but not both
Defendant contends that the trial court should have instructed the jury it could convict him of premeditated murder or felony murder, but not both. Defendant concedes, however, that the Supreme Court rejected this argument in State v. Cribbs, 967 S.W.2d 773, 787-88 (Tenn.1998). Therefore, Defendant asserts this issue strictly for the purpose of preserving it for further review. Accordingly, Defendant is not entitled to relief on this issue.
35. Instruction to jury that punishment for the crime of first degree murder would be considered at separate sentencing hearing if Defendant was found guilty
Defendant contends that a portion of the court’s instructions to the jury should have been deleted. Specifically, Defendant asserts that the jury should not have been instructed during the guilt-innocence phase of the trial that a separate sentencing hearing would be held if the jury found Defendant guilty of first degree murder. The trial court instructed the jury pursuant to Tennessee Pattern Jury Instruction 7.01(b) and 7.03(b) as follows:
If you so find, then it shall be your duty after a separate sentencing hearing to determine whether the defendant will be sentenced to death, life imprisonment without the possibility of parole, or life in prison, but you will not consider punishment for this offense at this time.
Defendant argues that the above-quoted portion of the jury charge was improper despite the fact that it was technically accurate, because the instruction had the possibility of diverting the jury’s attention from their sole task during that proceeding, which was to determine Defendant’s guilt or innocence. However, this court has held that a trial court’s failure to instruct the jury as to its role in punishing the defendant in a separate sentencing hearing if they found Defendant guilty of first degree murder necessitated a new trial. State v. Fuino, 608 S.W.2d 892, 895 (Tenn.Crim.App.1980). In Fuino this court specifically ordered the trial court to instruct the jury as to their duty to fix punishment after a separate sentencing hearing in the event of a verdict of first degree murder on remand. Id. at 896. Accordingly, the trial court did not err in giving the contested instruction. Defendant is not entitled to relief on this issue.
36.Use of styrofoam heads by Dr. Levy as demonstrative evidence
During Dr. Bruce Levy’s testimony, he used styrofoam heads to demonstrate, with a pen, the head wounds suffered by the victims. Defendant objected to the use of the demonstrative evidence, contending that the heads were unduly prejudicial. Defendant made this argument in the appeal of his Montgomery County convictions, and this court rejected *845 his challenge. The Supreme Court has affirmed our conclusion that the use of styrofoam heads by the medical examiner was not error. Reid, 164 S.W.3d at 344. In rejecting Defendant’s argument this court stated, and our Supreme Court has agreed with the following:
This court approved the use of this type of demonstrative evidence in State v. Robert E. Cole, No. 02C01-9207-CR-00165, 1993 WL 539185, *3 (Tenn.Crim. App., Jackson, Dec. 30, 1993). In Cole, this court concluded that the evidence was “highly probative as to the issues to be decided by the jury. Under the circumstances, the trial court did not err in admitting the challenged evidence.” Id. (citing State v. King, 718 S.W.2d 241 (Tenn.1986); State v. Sexton, 724 S.W.2d 371 (Tenn.Crim.App.1986)).
This court cannot find that the use of the styrofoam heads was inappropriate in this case as the appellant urges. The trial court did not err in its ruling that the use of the styrofoam heads would assist [the medical examiner] in demonstrating the location of the wounds. This issue is without merit.
Reid, 164 S.W.3d at 344.
The trial court in this case specifically found that the styrofoam heads would assist Dr. Levy in demonstrating the location of the victims’ wounds. This court cannot determine that the trial court erred in allowing the use of the demonstrative evidence. Defendant is not entitled to relief on this issue.
37. Recall of witness Robert Bolin by the State
The trial court allowed the State to recall witness Robert Bolin to correct his earlier testimony. Mr. Bolin had testified at trial that he sold Defendant a Larsen .25 automatic handgun. After his testimony, the witness reviewed an earlier police report and realized that he had misstated the brand of the handgun during his testimony at trial. The defense objected to the recall of witness Bolin. However, the trial court allowed the recall of Mr. Bolin for the limited purpose of clarifying his misstatement as to the brand of the handgun. The court allowed the recall because Mr. Bolin was correcting his testimony as to the brand of the gun, but was not adding to his testimony. On recall, Mr. Bohn testified that the handgun he sold to Defendant was not a Larsen handgun, but was a Raven handgun.
Defendant contends that the trial court’s action in permitting the recall of Mr. Bohn had the effect of allowing him to be a more credible witness than he actually was. Moreover, Defendant contends that the recall of Mr. Bohn must be compared to his request to recall Dr. Caruso at the competency hearing. However, the recall of witness Bohn differed greatly from the requested recall of Dr. Caruso. First, Mr. Bohn was a lay witness who made a misstatement on the stand. Dr. Caruso was an expert who had been compensated for his opinions and had provided his opinions in a written report. Second, Mr. Bohn merely needed to correct his testimony on the stand as to the brand of handgun he sold to Defendant. Dr. Caruso, however, would have been required to amend his expert report and alter the basis of his expert opinions. Furthermore, the trial court found that the circumstances surrounding the requested recall of Dr. Caruso were suspicious and lacking in credibihty. No such finding was made as to witness Bohn.
The trial court has discretion in determining whether it will allow a party to recall a witness, and it does not constitute error absent an abuse of discretion. State v. Caughron, 855 S.W.2d 526, 539 *846 (Tenn.1993); Lillard v. State, 528 S.W.2d 207, 212 (Tenn.Crim.App.1975). We cannot conclude that the trial court abused its discretion in allowing the State to recall Robert Bolin. Defendant is not entitled to relief on this issue.
38.Constitutionality of Tenn.Code Ann. Sec. 39-13-204
Defendant asserts that Tennessee Code Annotated Section 39-13-204 is unconstitutional. He asserts multiple challenges to the death penalty statutes, but acknowledges that the constitutional challenges he asserts have been decided adversely to him by the Supreme Court. He raises this issue merely to preserve it for later review.
The death penalty statutes have repeatedly been held constitutional. See e.g., State v. Reid, 91 S.W.3d 247, 313 (Tenn.2002); State v. Keen, 31 S.W.3d 196, 233 (Tenn.2000), cert. denied, 532 U.S. 907, 121 S.Ct. 1233, 149 L.Ed.2d 142 (2001); State v. Nesbit, 978 S.W.2d 872, 902 (Tenn.1998), cert. denied, 526 U.S. 1052, 119 S.Ct. 1359, 143 L.Ed.2d 520 (1999); State v. Vann, 976 S.W.2d 93, 117 (Tenn.1998), cert. denied, 526 U.S. 1071, 119 S.Ct. 1467, 143 L.Ed.2d 551 (1999); State v. Bland, 958 S.W.2d 651, 663 (Tenn.1997), cert. denied, 523 U.S. 1083, 118 S.Ct. 1536, 140 L.Ed.2d 686 (1998); State v. Cazes, 875 S.W.2d 253 (Tenn.1994); State v. Bigbee, 885 S.W.2d 797, 813-14 (Tenn.1994); State v. Smith, 857 S.W.2d 1, 21-22 (Tenn.), cert. denied, 510 U.S. 996, 114 S.Ct. 561, 126 L.Ed.2d 461 (1993); State v. Bane, 853 S.W.2d 483, 488 (Tenn.1993); State v. Harris, 839 S.W.2d 54 (Tenn.1992).
Accordingly, Defendant is not entitled to relief on this issue.
39. Admission of victim impact evidence
Defendant next contends that the trial court erred in denying his motion to exclude all victim impact evidence. Specifically, defendant argues that State v. Nesbit, 978 S.W.2d 872 (Tenn.1998), the case allowing victim impact testimony, had not been decided at the time of the crimes at issue; therefore, allowing victim impact testimony in this case would constitute a violation of Defendant’s right to be free from ex post facto laws. Defendant acknowledges that the Supreme Court rejected this precise issue against him in State v. Reid, 91 S.W.3d 247 (Tenn.2002), but asserts it for the purpose of preserving it for later review. Defendant is not entitled to relief on this issue.
40. [Deleted: Use of “mass murder” aggravating circumstance when defendant had not been convicted of other murders at the time of the commission of the crimes in this case]
41. [Deleted: Admission of evidence of the Captain D’s murders to establish the “mass murder” aggravating circumstance]
42. “Avoiding Arrest” aggravating circumstance
Defendant moved in a pretrial motion to strike aggravating circumstance (i)(6), the “avoiding arrest” aggravator, because it duplicates the elements of the underlying offense and therefore fails to narrow the class of death-eligible offenders in violation of the state and federal constitutions and it duplicates the elements of the (i)(7) aggravator and therefore fails to narrow the class of death-eligible offenders. The trial court denied Defendant’s motion. On appeal, Defendant argues that the trial court erred in denying the motion. *847 However, Defendant acknowledges that the Supreme Court has rejected his arguments. See State v. Bush, 942 S.W.2d 489, 504 (Tenn.1997) where the Supreme Court approved the use of the (i)(6) aggravator when an offense in addition to a murder occurred and State v. Blanton, 975 S.W.2d 269, 280 (Tenn.1998) where the Supreme Court approved the use of the (i)(6) and (i)(7) aggravators in the same case. Despite the Supreme Court’s rejection of Defendant’s arguments, he makes them in this appeal for the purpose of preserving the issue for further review. Defendant is not entitled to relief on this issue.
43.Life photographs of victims
Defendant challenges the introduction of photographs taken of the victims before they were murdered. Defendant asserts that the photographs, introduced during the victim impact testimony, served only to inflame the jurors and appeal to their emotions. The State counters that the photographs were probative of the issue of the impact of the death on the victims’ family members and to show those unique characteristics which provide a brief glimpse into the life of the victims. The Supreme Court has held:
[generally, victim impact evidence should be limited to information to show those unique characteristics which provide a brief glimpse into the life of the individual who has been killed, the contemporaneous and prospective circumstances surrounding the individual’s death, and how those circumstances financially, emotionally, psychologically or physically impacted upon members of the victim’s immediate family.
Nesbit, 978 S.W.2d at 887. In this case, the photographs were introduced to provide a brief glimpse into the lives of the victims, as allowed by Nesbit. Accordingly, the court did not err in allowing the introduction of these photographs. Defendant is not entitled to relief on this issue.
44. Victim impact testimony by family members
During the penalty phase, Iv-ette Rivera, wife of Ronald Santiago, testified as to the effect her husband’s death had on her life and the lives of her children. In so doing, she discussed the last time she and her children had seen Mr. Santiago. She also testified that her daughter will not allow anyone to call her “princess” because that is the nickname Mr. Santiago had for his daughter. Doyle Brown, Andrea Brown’s father, testified as to the difficulties he and his family were having in dealing with his daughter’s death. In his testimony he advised that his daughter’s room remained exactly the same, and they had kept the car that Andrea bought just before she was killed. He further stated: “It’s been real hard to learn that she won’t be here anymore.” Defendant maintains that these passages of testimony exceed the permissible scope of victim impact evidence.
Defendant did not object to the testimony by either Ivette Rivera or Doyle Brown; therefore, this issue is waived. See State v. Thornton, 10 S.W.3d 229, 234 (Tenn.Crim.App.1999) (citing Tenn.R.App. P. 36(a)); State v. Green, 947 S.W.2d at 188. Further, we find that the testimony by Ms. Rivera and Mr. Brown was proper victim impact testimony under Nesbit, 978 S.W.2d at 879. Accordingly, Defendant is not entitled to relief on this issue.
45. Non-statutory mitigating circumstances
Defendant requested that the trial court instruct the jury as to twenty-four specific non-statutory mitigating circumstances. Defendant asked that the non-statutory mitigators be charged verbatim. *848 The trial court denied Defendant’s request. Instead, the court instructed the jury on eleven general categories of mitigating circumstances. Defendant contends that the trial court erred in charging the general non-statutory mitigators, but admits that the trial court’s instruction complied with current case law.
The Supreme Court affirmed the trial court’s denial of a similar request made by Defendant in his appeal of his convictions of the Captain D’s murders. In that case, Defendant requested that the trial court instruct the jury as to twenty-eight specific non-statutory mitigating circumstances. Reid, 91 S.W.3d at 305. In affirming the trial court’s denial of Defendant’s request for the twenty-eight non-statutory miti-gators, the Supreme Court relied on State v. Odom, 928 S.W.2d 18, 31 (Tenn.1996), where the court had held that instructions on non-statutory mitigating circumstances must not be fact specific and thereby imply to the jury that the court had made a finding of fact in contravention of Article VI, Section 9 of the Tennessee Constitution. The Reid Court determined that the trial court had not erred in providing instructions to the jury, as it had provided non-statutory mitigating circumstances drafted in general categories, which were drafted in a similar style to the statutory mitigating circumstances and were substantially the same as the instructions requested by Defendant. Reid, 91 S.W.3d at 307.
In this case, the trial court complied with Tennessee case law in charging the jury with the eleven general non-statutory mitigating circumstances. The mitigating circumstances were drafted in a style similar to the statutory circumstances, they embodied the requests made by Defendant, and they reflected the proof presented during the sentencing hearing. Aceord-ingly, the trial court did not err in this regard. Defendant is not entitled to relief on this issue.
46. Jury instruction on victim impact testimony
As previously set forth, Defendant filed a motion to exclude all victim impact evidence. Defendant also challenged the victim impact jury instruction in State v. Nesbit, 978 S.W.2d 872, 892 (Tenn.1998). The instruction reads as follows:
You may consider the victim impact evidence in determining the appropriateness of the death penalty only if you first find that the existence of one or more aggravating circumstances has been proven beyond a reasonable doubt by evidence independent from the victim impact evidence, and find that the aggravating circumstance(s) found outweigh the finding of one or more mitigating circumstances beyond a reasonable doubt.
Defendant contends that the Nesbit instruction is illogical and that victim impact evidence is irrelevant under the death penalty statute. However, victim impact evidence has been declared constitutional by the United States Supreme Court and the Tennessee Supreme Court. Payne v. Tennessee, 501 U.S. 808, 827, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991); State v. Nesbit, 978 S.W.2d 872, 889 (Tenn.1998), cert. denied, 526 U.S. 1052, 119 S.Ct. 1359, 143 L.Ed.2d 520 (1999). Furthermore, the argument advanced by defendant that victim impact testimony is irrelevant and should be excluded under Tennessee’s current capital sentencing system, has been rejected by the Supreme Court. See State v. Reid, 91 S.W.3d at 282-83, holding that any contradiction between the statute and the Nesbit instruction inures to the benefit of Defendant; therefore, this argument does not entitle Defendant to relief.
*849 47. [Deleted: Sufficiency of evidence to support jury’s finding that aggravating circumstances outweighed mitigating factors beyond a reasonable doubt]
48. [Deleted: Proportionality Review]
[Deleted: CONCLUSION]